IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

IN THE MATTER OF THE SEARCH OF
THE PERSON OF DEREK FLATEN AND
1925 BURLINGTON DRIVE, WEST
FARGO, NORTH DAKOTA 58078

Case No. 3:25-mj-337

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Chad Tuura, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1925 Burlington Dr, West Fargo, North Dakota 58078, hereinafter "PREMISES," which is believed to be the residence of Derek Flaten (DEREK FLATEN) and further described in Attachment A, for the items described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been employed since December 2021. I am a graduate of the FBI Basic Training Course in Quantico, VA. I earned a graduate degree in Educational Administration. I have been assigned to the Minneapolis Division, Fargo, North Dakota Resident Agency since April 2022. In that time, I have been investigating a wide range of crimes including various white-collar crimes, to include insurance and wire fraud.

3.      The facts and information set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses. All observations not personally made by me were related to me by the individuals who

made or were conveyed to me by my review of records, documents, and other physical evidence obtained during the course of the investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 1014 have been committed by DEREK FLATEN.  Title 18 U.S.C. § 1014 criminalizes the act of knowingly making any false statements or report for the purpose of influencing in any way the action of the Federal Crop Insurance Corporation or a company the Corporation reinsures. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## PROBABLE CAUSE

5.      The FBI is investigating Dan Flaten (DAN), B.F., and DEREK FLATEN (collectively "Flatens") for committing crop insurance fraud. As explained below, there is sufficient probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## DEFINITION OF TERMS

6.      Approved Insurance Provider (AIP): An AIP services crop insurance policies on behalf of the government. AIPs have a contract with the government, called the Standard Reinsurance Agreement, to sell and administer crop insurance policies to producers. Their responsibilities include writing policies and conducting loss adjustments when losses occur.

7.    <u>Prevented Planting</u>: According to the USDA RMA website (https://rma.usda.gov) the Prevented Planting insurance coverage "provides producers valuable protection in the event they are unable to plant an insured crop by the provided final planting date or during the late plating period due to an insured cause of loss." Failure to plant because of uninsured causes such as lack of proper equipment, inadequate personnel, or use of a particular production method are not considered valid reasons for prevented planting.

8.    <u>Anomalous Producer Score:</u> The scoring system evaluates three independent measures:

**a.**  Severity – Loss Cost (indemnity divided by liability)

**b.**  Frequency – rate of filing claims

**c.**  Size of Loss – amount of indemnity

Each measure is assigned a weight of importance. For this scoring system, severity is considered the most important (39.5%), followed by frequency (36%), and finally, size of loss (24.4%). Each measure is calculated relative to those of all other producers for the same crop, type, and practice in the same area. A high score (maximum of 49) means the identified producer has more severe losses, tends to have losses more often, and has larger indemnities when compared to other producers, for the same crop, type, and practice in the same area. The last five years of a producer's loss history for crop, type, and practice in an area are part of the score calculation. Because of the peer and history comparison, only a few producers can have high scores.

9.    <u>The Hyper Dynamic Reporting Application (HyDRA)</u> is the primary tool used to securely provide information to HyDRA users. HyDRA is an online resource that enables users to access numerous reports. The HyDRA application is an RMA application developed and

3

maintained by the Center for Agribusiness Excellence (CAE). CAE's mission is to provide research, training, and resources for data warehousing and data mining of Farm Service Agency (FSA) and Risk Management Agency (RMA) data. CAE provides facilities and staff to make full use of data warehousing and data mining technologies to develop RMA products.

## BACKGROUND

10.     According to a report produced by United States Department of Agriculture (USDA), Risk Management Agency (RMA), Special Investigations Staff (SIS) director, Margorito Hinojosa, their agency initiated an investigation as a result of a referral from the Northern Regional Compliance Office (NRCO). The NRCO received an OIG Hotline complaint from an insurance adjuster and subsequently an Approved Insurance Provider (AIP) referral. The OIG Hotline complaint alleged suspicions of the Flaten family hiding crop yield production and abusing the Prevented Planting PP program. The complaint also included suspicions of concealment by using multiple AIPs involving different North Dakota counties and crops. The AIP referral included concerns of yield anomalies on claims between DAN and other area producers. The AIP conducted a Normalized Difference Vegetation Index (NDVI) imagery review and found that DAN's fields looked comparable to neighboring farms during the growing season, yet he reported lower yields on his claim.

11.     RMA conducted six compliance reviews of the Flatens dating back to 2011. The cases involved an array of different compliance issues including share discrepancies, PP abuse, an assault on an adjuster, destroying crops intentionally, and hiding production. An NRCO compliance review resulted in AIP findings and monetary recoveries due to PP claimed that was not general to the area.

12.     The NRCO combined the two most recent cases and referred the cases to SIS. These cases involved allegations that the Flatens filed more PP acres than other area producers, even when other producers plant timely, and that they concealed production on claims. Additionally, the AIPs have been more diligent and aware of the Flatens alleged schemes due to the ARPA list and RMA investigations. The AIPs identified recent instances where the Flatens falsely certified their plant dates to evade guarantee reductions. This revelation resulted in one AIP denying an insurance claim made by DAN for his 2023 corn production.

13.     SIS reviewed the Flatens' loss history, producer score reports, and the RMA Spot Check List (SCL). The Flatens received over $11 million in indemnities since 1994 with over $7 million in indemnities between 2019 and 2023, the current scope of this investigation. The table below depicts Cass County producers' corn and soybean losses for the years 2022 and 2023 compared to DEREK FLATEN's losses (data provided by HyDRA). DEREK FLATEN's Loss Ratio is consistently much higher than the county average.

| 2022 - 2023 Cass County Corn and Soybean Losses (includes PP) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Crop year | Commodity Name | State Abbrv | County Name | Policies Sold | Policies Indemnified | Liabilities ($) | Total Prem ($) | Subsidy ($) | Indemnity ($) | Loss Ratio |
| 2022 | Corn | ND | Cass | 953 | 331 | $225,219,211 | $27,983,417 | $19,741,530 | $28,255,609 | 12.55% |
| 2022 | Soybeans | ND | Cass | 990 | 248 | $187,059,779 | $21,080,283 | $13,391,118 | $4,884,252 | 2.61% |
| 2023 | Corn | ND | Cass | 986 | 242 | $271,107,468 | $31,107,011 | $21,630,990 | $12,626,442 | 4.66% |
| 2023 | Soybeans | ND | Cass | 1004 | 185 | $178,926,762 | $18,024,079 | $11,458,939 | $4,964,025 | 2.77% |
| 2022 - 2023 Cass County Derek Flaten Corn and Soybean Losses (includes PP) | | | | | | | | | |
| Crop Year | Producer | State Abbrv | County Name | Crop | Sum of Liability | Sum of Indemnity | Loss Ratio | | |
| 2022 | Flaten, Derek | ND | Cass | Corn | $1,031,164 | $559,023 | 54.21% | | |
| 2022 | Flaten, Derek | ND | Cass | Soybeans | $311,185 | $98,549 | 31.67% | | |
| 2023 | Flaten, Derek | ND | Cass | Corn | $776,792 | $306,779 | 39.49% | | |
| 2023 | Flaten, Derek | ND | Cass | Soybeans | $882,945 | $321,427 | 36.40% | | |

14.     DAN, B.F., and DEREK FLATEN all have anomalous producer scores between 25 to 39 compared to the rest of the county aggregate scores of 6 to 12 (see table below for reference).

| Score | Producers | Insured Producer Percent |
|-------|-----------|--------------------------|
| 0 | 349,804 | 40.87 |
| 1-9 | 211,202 | 24.68 |
| 10-19 | 172,922 | 20.20 |
| 20-29 | 85,299 | 9.97 |
| 30-39 | 32,541 | 3.80 |
| 40-49 | 4,097 | 0.48 |
| **Total** | **855,865** | **100.00** |

15.     Additionally, DAN has been on the SCL every year between 2015 to 2022 for a variety of scenarios including Book of Business, Excessive Yield, Increasing Losses, and Indemnities with high yields.

16.     SIS referred this matter to the Office of Inspector General (OIG), and they opened case number CH- 0510-0013 for crop insurance fraud under 18 U.S.C § 1014 allegations. OIG, in cooperation with SIS, the Federal Bureau of Investigation (FBI), and the North Dakota U.S. Attorney's office have ongoing cases investigating the allegations.

17.     During the course of the investigation, SIS learned the Flatens operate mostly as a single farm; however, they report and insure crops through individual policies. DAN signed many documents using Power of Attorney (POA) on behalf of his sons, B.F. and DEREK FLATEN. They also insure different counties, and even crops within a single county, with multiple AIPs. Thus, an insurer of one crop my not be aware of claims made against other crops.

18.     The investigation developed evidence that the Flatens routinely hide production in each other's names to manufacture losses on some crops, while artificially inflating yields on crops designated as non-loss. Future crop insurance indemnities are based on the size of past yield years,

so inflating yields would have the effect of increasing indemnities in future years, as well as to maintain PP acre eligibility. Additionally, evidence shows that the Flatens have back dated their certified planting dates in some cases, having planted weeks after the date they certified on their acreage report. By back dating, the Flatens have avoided reduced indemnities that would result from planting later than the crop insurance policies permit.

19.    The following is a specific example representative of the type of evidence gathered in the investigation:

a.  Rural Community Insurance Services (RCIS) is an AIP that insured some of DEREK FLATEN's crops.  According to RCIS 2023 Schedule of Insurance documents, between Cass and Traill counties, DEREK FLATEN insured a total of 2,312.54 acres of soybeans with RCIS. DEREK FLATEN received a $321,427 indemnity, and RMA paid $72,484.98 in subsidies on DEREK FLATEN's behalf on the Cass County policy.

b.  On October 24, 2023, DEREK FLATEN submitted a Notice of Loss to his insurance agent Jan Vetter (VETTER). DEREK FLATEN claimed a September 2023 drought damaged his soybeans. RCIS assigned claims adjuster Matt Peterson (PETERSON) to DEREK FLATEN's claim.

c.  On January 17, 2025, SIS and I interviewed PETERSON regarding this claim. During that interview, PETERSON stated that on or around February 29, 2024, PETERSON met DEREK FLATEN at his residence to adjust and finalize the above-mentioned claim. During this meeting, DEREK FLATEN made annotations on his grain delivery records ("assembly sheets") from Clifford Farmer's Co-op (CFC) as evidence of harvest records for his claim. DEREK FLATEN marked on

the assembly sheets which truckloads of soybeans were harvested from the fields he claimed a loss on. DEREK FLATEN told PETERSON during the meeting that the provided CFC assembly sheets represented his entire soybean production for 2023. When asked about the other truckloads on the CFC assembly sheets, DEREK FLATEN stated those truckloads were from non-loss soybean fields.

**d.** When making a claim through RCIS, the insured must complete and sign a Production Worksheet Summary (PWS) which details the production and loss from each piece of land. Above the signature line on the form it states the following:

**i.** *"I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. § 1006 and § 1014; 7 U.S.C. § 1506; 31 U.S.C. § 3729, § 3730 and any other applicable federal statutes.) . . ."*

**e.** On 2/29/2024, DEREK FLATEN signed the PWS, certifying his 2023 soybean production (see below).

I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. §1006 and §1014; 7 U.S.C. §1506; 31 U.S.C. §3729, §3730 and any other applicable federal statutes.) I understand the certified information on this Production Worksheet will be used to determine my loss, if any, to the above unit. The AIP may audit and approve this information and supporting documentation. The Federal Crop Insurance Corporation, an agency of the United States, subsidizes and reinsures this crop insurance. See attached statements required by Privacy Act of 1974.

| INSURED'S SIGNATURE | DATE | ADJUSTER'S SIGNATURE | CODE NO. | DATE |
|---|---|---|---|---|
| *[signature]* | 02/29/2024 | *[signature]* | 033562 | 02/29/2024 |

**f.** When a claim exceeds $200,000, RCIS' policy is to conduct a large claim review. Area Claims Manager, Melvin Van Beek (VAN BEEK), was tasked to conduct the review. On January 17, 2025, SIS and I interviewed VAN BEEK regarding this

review. During that interview, VAN BEEK stated after completing his review of the paperwork, he called DEREK FLATEN on or around March 15, 2024, to set up a meeting. On the call, DEREK FLATEN stated he did not want to meet, so VAN BEEK asked DEREK FLATEN over the phone if the CFC assembly sheets represented his entire soybean production from 2023. DEREK FLATEN replied, "Yes." VAN BEEK documented this phone call on his Claim/QC Review Report (see below).

# ≡RCIS®

Rural Community Insurance Company

**Claim/QC Review Report**

| 1. POLICY NUMBER | 2. COUNTY | 3. UNIT NUMBER(S) | 4. CROP | 5 CROP YEAR |
|---|---|---|---|---|
| ND-951-288280 | CASS | 1-2,3,4,8,9,10,11,26;2-1,3. | SBEAN-RP | 2023 |

| 6. CLAIM NUMBER | 7. INSURED'S NAME |
|---|---|
| | DEREK FLATEN |

| 8. AGENT CODE NUMBER | 9. SHAREHOLDER/POLICY NUMBER |
|---|---|
| 333053-01 | DAN FLATEN |

| 10. NUMBER OF CORRECT UNITS | 11. NUMBER OF ERROR UNITS | 12. TOTAL UNITS |
|---|---|---|
| 13 | 0 | 13 |

**13. WERE THE REQUIRED FORMS IN THE INSURED'S FILE FOLDER?**
☑ YES   ☐ NO

**14. WERE ENTRIES REVIEWED AND VERIFIED AS CORRECT ON THE FOLLOWING:**

| | | | | |
|---|---|---|---|---|
| ☑ YES ☐ NO Heading of Acreage Report | | ☑ YES ☐ NO Heading of the Production Worksheet | | |
| ☑ YES ☐ NO Body of Acreage Report | | ☑ YES ☐ NO Section I of the Production Worksheet | | |
| ☑ YES ☐ NO Application | | ☑ YES ☐ NO Section II of the Production Worksheet | | |

**15. WAS ALL NECESSARY INFORMATION ENTERED IN NARRATIVE?**
☑ YES   ☐ NO

**16. WERE ALL REQUIRED SIGNATURES OBTAINED?**
☑ YES   ☐ NO

**17. YIELDS CERTIFIED BY INSURED ARE REASONABLE? IF NOT EXPLAIN IN NARRATIVE.**
☑ YES   ☐ NO

**18. CORRECTED FORMS PREPARED: (LAM GUIDELINES / APH REVIEW)**
☐ APH   ☐ A/R   ☐ P/W

**19. NARRATIVE**

The Claim file was very complete. All necessary information was entered in the narrative. Required signatures obtained: PW was signed 2/29/2024; MPCI APP was signed 3/15/2021; the Acreage Report was signed 7/17/2023. Yields as certified by the Insured are reasonable. I talked to the Insured and he confirmed that all of his 2023 soybean production was hauled to the Clifford Farmers CO-OP Elevator as reported to the Adjuster.

| 20. DATE OF INSPECTION | 21. FIELD INSPECTED BY: |
|---|---|
| 3/15/2024 | TONY BAASCH |

| 22. ADJUSTER'S NAME | 23. CODE NUMBER |
|---|---|
| MATT PETERSON | 33-562 |

| 24. DATE REVIEWED WITH ADJUSTER | 25. ADJUSTER'S SIGNATURE |
|---|---|
| 3/15/2024 | BY PHONE |

**26. TYPE OF REVIEW '(If selecting COI then a Production and Yield Audit Report (MP-3017) must be completed and included with this form)**
☐ COI*      ☐ Special (RMA)      ☑ Mandatory High $      ☐ DMR Spot Check      ☐ Other

**I certify that the above has been reviewed.**

| 27. REVIEWER'S SIGNATURE | | 28. CODE NUMBER | 29. DATE |
|---|---|---|---|
| MELVIN VAN BEEK | Digitally signed by MELVIN VAN BEEK Date: 2024.03.18 13:38:37 -05'00' | 33-516 | 3/18/2024 |

MP-7008 (09-21)                     Page 1 of 1

**g.**  VAN BEEK submitted his report to the RCIS claims department and DEREK FLATEN was awarded a $321,427 indemnity.

**h.**  USDA OIG subpoenaed DEREK FLATEN's Western State Bank records. After a review of the records, it was discovered that DEREK FLATEN received payments from four different grain elevators in 2023: CFC, Maple River Grain and Agronomy (MRGA), CHS-Dakota Plains Ag (CHS), and Mayport Farmers Co-op.  Subpoenas were served on all four elevators requesting all grain delivery records for the Flatens. A review of the returns revealed that in addition to CFC, DEREK FLATEN sold 2023 soybeans to MRGA and CHS.

**i.**  According to the elevator records, DEREK FLATEN sold a total of 16,936.4 bushels of soybeans to MGRA and CHS. DEREK FLATEN's bank records showed he was paid a total of $223,044.70 for soybeans by MGRA and CHS. The last payment he received from either elevator was January 31, 2024. DEREK FLATEN certified a loss on his 2023 soybeans on the RCIS PWS on February 24, 2024, and again with VAN BEEK on March 15, 2024. DEREK FLATEN omitted the soybean production sold to CHS and MGRA to RCIS staff.

**j.**  SIS reviewed USDA data and maps to review crop insurance certified yields for 2023 soybeans in the areas where DEREK FLATEN farms. In the image below, DEREK FLATEN certified yields between 8 and 14 bushels of soybeans per acre, while producers who farm in the same area certified yields between 35 and 45 bushels per acre.



**k.** The image below depicts two connected fields where DEREK FLATEN planted

and harvested soybeans in 2023; one field he farmed on his own, and the other

was shared by his father, DAN. The shared field had a certified yield of 31

bushels per acre, while the other field had a certified yield of 15 bushels per acre.

Furthermore, the producers in the surrounding area all reported yields between 45

and 52 bushels per acre.



Certified Soybean Yields

Cass County, ND

Crop Year 2023

l.  The below image shows another area in which DEREK FLATEN farmed

soybeans in 2023. Cass County fields 10002 and 10003, highlighted with a red

outline, DEREK FLATEN reported an 18 and 11 bushel per acre yield, while the

other producers in the are reported yields between 28 and 72 bushel per acre.



**m.** In September 2024 and January 2025, SIS and I conducted interviews of 15 different producers who farmed land near DEREK FLATEN in 2023. None of the neighboring farmers recalled DEREK FLATEN's fields looking any different from the soybeans planted in the fields around his. Many stated that yields below 15 bushels per acre would have to have sustained significant damage and would have a very different appearance than a 30 to 40 bushel per acre yielded field. Also, multiple people stated DEREK FLATEN tends to plant late.

**n.** In order to be eligible for full coverage of an insurance claim, farmers need to plant their crop prior to the final designated planting date. The final planting date for soybeans in 2023 was June 10, 2023. DEREK FLATEN certified planting all of his soybeans prior to June 10th (see below).

**≥RCIS®**
RURAL COMMUNITY INSURANCE COMPANY

**Acreage Reporting Form**

| 1. Insured Information | | | 2. Agent / Agency Information | | 3. Crop Year | 4. Policy Number |
|---|---|---|---|---|---|---|
| DEREK FLATEN<br>5331 COUNTY RD 81 S<br>HICKSON, ND 58047 | | | JAN VETTER CROP INSURANCE LLC<br>JAN M VETTER<br>2229 SHEYENNE ST<br>WEST FARGO, ND 58078-6920 | | 2023 | ND-951-288280 |
| | | | | | 5. State Code / Name | |
| Person Type INDIVIDUAL | | | Email janvettercrop@hotmail.com | | ND | NORTH DAKOTA |
| Phone (701) 238-9801 | | SSN XXX-XX-7063 | Phone (701) 799-2578 | Agency Code 33-3053-01 | | |

| 6. County | 7. Crop / Plan | 8. Type | 9. Practice | 10. FPD | 11. Unit Structure Election* | 12. Level | 13. % of Price | 14. Options, Elections or Endorsements |
|---|---|---|---|---|---|---|---|---|
| CASS | BARLY / RP | | | 05/31/23 | □BU □OU | 75 | 100% | YA,YC |
| CASS | BEANS / RP | | | 05/10/23 | □BU □OU | 75 | 100% | EU01,YA,YC |
| CASS | SBEAN / RP | | | 06/10/23 | □BU ☒OU | 75 | 100% | CP,PY,TA,YA,YC |
| CASS | SNFLR / RP | | | 06/15/23 | □BU □OU | 75 | 100% | EU01,YC,YE |
| CASS | WHEAT / RP | | | 05/31/23 | □BU □OU | 75 | 100% | EU01,YA,YC |

LLT = Landlord/Tenant

| 15. County | 16. Unit | 17. Type | 18. Practice | 19. Sect Twp Rng /FN Or Other | 20. Share | 21. Shareholder [ LLT ] | 22. Acres/ Qty | 23. LLT | 24. Date Planting Completed | 25. Area Class | 26. Appr Yield | 27. Additional Information |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crop / Plan | Unit Structure | Commodity Class SubClass Intended Use | Irrigation Cropping Organic Interval | FSA Farm /Tract / Field | | Farm Name | Acreage Type** | | | | | |
| CASS<br><br>BARLY / RP | | NTS<br><br>NPS | | | | | ∅ | □ LLT | | | | □Meas. Req. □Malt Barley<br>□CRP/USDA □NB □NS □NS <= 5 |
| CASS<br><br>BEANS / RP | | NTS<br><br>NPS | | | | | ∅ | □ LLT | | | | □Meas. Req. □CRP/USDA □NB<br>□NS □NS <= 5 |
| CASS<br><br>SBEAN / RP | 0001-0002-000 | COMM<br><br>NIRR | | 0003-138N-050W/11990*<br>11990/13842/1 | 1.0000 | f1 | 153.79 | □ LLT | 6/16 | | 44.00 | □Meas. Req. □CRP/USDA □NB<br>□NS □NS <= 5 |
| CASS<br><br>SBEAN / RP | 0001-0003-000 | COMM<br><br>NIRR | | 0003-138N-050W/11990*<br>11990/13842/1 11990/13843/1 | 1.0000 | f1<br>f1 | 77.02<br>74.39 | □ LLT | 6/16 | | 50.00 | □Meas. Req. □CRP/USDA □NB<br>□NS □NS <= 5 |

Sms 2207.92

Printed from CIMax.
P-4000 (06-23)

Page 1 of 7

ENTERED
BY SOI

06/19/2023

**o.** Bayer Climate FieldView (FieldView) is a digital farming platform that helps farmers collect, store, and analyze field data. Upon review of DEREK FLATEN's financial records, SIS learned that DEREK FLATEN pays a subscription to FieldView, so a subpoena was served to the company for any records related to DEREK FLATEN. According to the FieldView records, DEREK FLATEN planted his soybeans between June 13, 2023, and June 18, 2023. Had DEREK FLATEN notified his AIP that the soybeans were planted late, any indemnity paid toward losses from those soybean crops would have been reduced. By not

18

disclosing the late planting, DEREK FLATEN avoided any reduction in indemnities paid.

**p.** DEREK FLATEN submitted a soybean claim. He certified to RCIS that he harvested three truckloads of soybeans from field 10002 and two from 10003 in Cass County, ND, delivered to CFC on October 12, 2023, and October 13, 2023 (see below).



**q.** However, satellite imagery of Cass County fields 10002 and 10003 showed they was not harvested until after 10/22/2023 (see images below).



**USDA** Imagery: October 12, 2023        **Crop Year: 2023**

10002
SOYBEANS
18
153.79

Cass

10003
SOYBEANS
11
151.41

Derek Flaten
PLSS

Unit Number
Certified Crop
Certified Yield (bushels per acre)
Certified Acres

0           0.5 Miles

N

Image Source: Sentinel 2
Image Date: October 12, 2023



**USDA**    Imagery: October 22, 2023                    Crop Year: 2023

10002
SOYBEANS
18
153.79

Cass

10003
SOYBEANS
11
151.41

Derek Flaten
PLSS

Unit Number
Certified Crop
Certified Yield (bushels per acre)
Certified Acres

0          0.5 Miles

N

Image Source: Sentinel 2
Image Date: October 22, 2023



**USDA** Imagery: October 29, 2023                                     Crop Year: 2023

Derek Flaten
PLSS

Unit Number
Certified Crop
Certified Yield (bushels per acre)
Certified Acres

Image Source: Sentinel 2
Image Date: October 29, 2023

0                    0.5 Miles

N

    **r.**   The satellite imagery demonstrates that the truckloads delivered to the CFC elevator on October 12 and 13 could not have come from fields 10002 or 10003.

    **s.**   A federal crop insurance policy must be voided if the policyholder or anyone assisting the policyholder intentionally concealed or misrepresented any material fact relating to the policy (7 C.F.R. § 457.8). DEREK FLATEN withheld the fact that he sold soybean production to MRGA and CHS in 2023, even though he was given multiple chances by the AIP to provide that information.

20.    The total damages to RMA and the Federal Crop Insurance Corporation from the example provided above is $393,911.98. According to SIS, between 2021 and 2024, there is evidence that the Flatens have received approximately $4,958,085 in fraudulent payments from Federal Crop Insurance.

21.    On November 20, 2024, one of the Flaten's crop insurance agents, VETTER, was interviewed by SIS. During the interview, VETTER stated she has been DAN's insurance agent since 2012. In 2021, VETTER recalled DEREK FLATEN separating his farming operations from DAN, to include signing his own crop insurance forms and filing his own insurance claims. VETTER stated she has never seen a farmer use multiple insurance agents or multiple insurance companies. She believed the only reason a farmer would conduct business in this way would be to exploit the insurance program. VETTER mainly communicated with DEREK FLATEN via text message or phone call. She believed DEREK FLATEN often uses the application SnapChat while he is working in the fields.

22.    On 4/9/2025, SIS interviewed a former employee of DEREK FLATEN, Justin Marcks (MARCKS). MARCKS worked for DEREK FLATEN from 2020 to 2022. A few of his responsibilities included combining, driving trucks, and spraying crops. MARCKS explained that

DEREK FLATEN kept track of his farming data through a tablet. The combines used to harvest would send yield data and GPS coordinates to an application on the tablet. While he was in the field harvesting, MARCKS recalled DEREK FLATEN telling him that he could monitor the combine data live on his tablet from his home. MARCKS also explained how the combine monitors stored data on SD cards, which he believed DEREK FLATEN would take out to review on his computer. MARCKS recalled DEREK FLATEN keeping his tablet in a briefcase.

23.     On the same day, a seasonal employee of DEREK FLATEN, Michael Limon (LIMON), was interviewed by SIS and me. During the interview, LIMON stated that DEREK FLATEN always used his iPad to keep track of his farming operations. During harvest, DEREK FLATEN would monitor the harvesting production on his iPad. LIMON explained that when he would get close to finishing harvesting a field and DEREK FLATEN was not present, DEREK FLATEN would call him on his phone to instruct him on what field to harvest next.

24.     Also, on 4/9/2025, SIS and USDA OIG interviewed a current employee of DEREK FLATEN, Travis Lauckner (LACKNER). During the interview, LACKNER stated DEREK FLATEN's farming equipment sends planting and harvest data to an application on DEREK FLATEN's phone and tablet. He explained that DEREK FLATEN uses his phone and tablet to keep track of all farming operations. LACKNER stated DEREK FLATEN keeps his tablet in a "portfolio" type of case.

25.     It is also reasonable to believe that DEREK FLATEN carries a personal cell phone or other personal electronic devices on his person while away from his home and that those items might be found on his person during a search of the SUBJECT PERSON. Further, based on my experience, I know that people who own personal electronic devices also sometimes keep those items in their vehicles for safekeeping, transportation between multiple

locations, and ease of use. It is therefore also reasonable to believe these types of items may be found within vehicles belonging to DEREK FLATEN, whether located on his property or elsewhere within the District of North Dakota.

## TECHNICAL TERMS

26.     Based on my training and experience, I use the following technical terms to convey the following meanings:

**a.** IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

**b.** Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

**c.** Storage medium: A storage medium is any physical object upon which computer

data can be recorded. Examples include hard disks, RAM, floppy disks, flash

memory, CD-ROMs, and other magnetic or optical media.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the PREMISES, in whatever form they are found. One

form in which the records might be found is data stored on a computer's hard drive, tablet, cellular

phone, or other storage media. Thus, the warrant applied for would authorize the seizure of

electronic storage media or, potentially, the copying of electronically stored information, all under

Rule 41(e)(2)(B).

28.     *Probable cause.* I submit that if a computer or storage medium is found on the

PREMISES, there is probable cause to believe those records will be stored on that computer or

storage medium, for at least the following reasons:

**a.** Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic

files downloaded to a storage medium can be stored for years at little or no cost.

Even when files have been deleted, they can be recovered months or years later

using forensic tools.  This is so because when a person "deletes" a file on a

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

**b.** Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

**c.** Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

**d.** Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

29.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

31.  I submit there is probable cause for a warrant to search the items described in Attachment A for the information described in Attachment B. Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

_____
Chad Tuura

Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on _April 30, 2025_____, 2024

via telephone.

ALICE R. SENECHAL
UNITED STATES MAGISTRATE JUDGE